*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* K. M. HOUSER, Minor.

UNPUBLISHED
March 26, 2019

Nos. 344698; 344712
Genesee Circuit Court
Family Division
LC No. 16-133554-NA

Before: SHAPIRO, P.J., and BECKERING and M. J. KELLY, JJ.

PER CURIAM.

In Docket No. 344698, respondent-father appeals as of right the trial court's order terminating his parental rights to the minor child, KMH, under MCL 712A.19b(3)(c)(*i*), (g), and (j). In Docket No. 344712, respondent-mother appeals as of right the same order terminating her parental rights to KMH under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j). Because we conclude that the trial court did not clearly err by terminating respondents' parental rights, we affirm.

## I. BASIC FACTS

The Department of Health and Human Services (DHHS) filed a petition seeking termination of respondents' parental rights to KMH. Respondents pleaded to jurisdiction with the understanding that the DHHS would change the goal from termination to reunification. At that time, respondent-father admitted that his ability to parent his child was affected because (1) he lacked suitable housing, (2) he had mental-health issues that were not being treated, and (3) he did not have a source of income to support KMH. Respondent mother similarly admitted that her ability to parent KMH was affected because (1) she lacked suitable housing, (2) she has depression that was not being treated, and (3) she has a "learning disability." Thereafter, on January 10, 2017, the court entered an order taking jurisdiction of KMH. Further, the court ordered that respondents be provided with accommodations pursuant to the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, and that they receive a referral to the Genesee

-1-

Circuit Court Infant/Toddler Treatment Court, also known as "Baby Court."[1]  In May 2017, respondents were admitted into Baby Court.

Respondents were accepted into Baby Court.  They were provided with reunification services including psychological evaluations, counseling, parenting classes, budgeting and housing assistance, and parenting time.  Although respondents made some progress and completed some services, problems with suitable housing persisted throughout the case, and there continued to be reports that respondents' "bickering" and fighting during parenting time was having an adverse effect on KMH.  Accordingly, the DHHS submitted a supplemental petition seeking termination of respondents' parental rights.  Following a termination hearing, the court found grounds to terminate respondents' parental rights and found that termination of their parental rights was in KMH's best interests.

This appeal follows.

---

[1] Erin Werth, the program coordinator of the Genesee County Baby Court program, testified about the nature of Baby Court.  She explained:

> Baby court is a problem solving court for families with infants and toddlers in foster care.  We follow and utilize the infant mental health model in order to provide therapeutic support.  The infant mental health model requires that we have an infant mental health endorsed therapist.  We have a therapist assigned to every case.  They provide therapeutic support during visitation weekly as well as weekly individual parenting sessions where they meet with the parents without the child to discuss different barriers to parenting, their focus is on the attachment relationship and reducing the negative outcomes that infants and toddlers usually face as a result of being in foster care.  We also have a specialized parenting class.  We use the—an adaption of the mom power curriculum which is evidence based and that focuses on attachment and development and so we—and that is run by a master level therapist as well, as well as a playgroup.  The playgroup is for participants who are in the parenting class so that they can, with therapeutic support and the support of their peers, practice the skills that they're learning in parenting class.  So it's—it's usually, it's they go to playgroup and then they go to parenting class every other week.

Werth added that in baby court "reunification is the goal and so we provide—we also do monthly team meetings so we develop a team that has infant mental health, DHHS, any private agency worker that we may have in the family and sometimes some family support or community support depending on a case by case basis."  She stated at the monthly meetings, they discuss the barriers to reunification and discuss what they are going to do in order to overcome the barriers.

## II. STATUTORY GROUNDS

### A. STANDARD OF REVIEW

Respondents argue that the trial court erred by finding statutory grounds to terminate their parental rights. Whether the trial court properly found by clear and convincing evidence that a statutory ground for termination has been proven is reviewed for clear error. *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000); MCR 3.977(K). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

### B. ANALYSIS

The court terminated both respondents' parental rights under MCL 712A.19b(3)(c)(*i*), which provides that a court may terminate a respondent's parental rights if there is clear and convincing evidence that:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

Here, it is undisputed that more than 182 days elapsed since the initial dispositional order was entered. Additionally, based on our review of the record, it is clear that the conditions leading to adjudication for respondent-mother were inadequate housing, cognitive limitations, and untreated depression, whereas the conditions leading to adjudication for respondent-father included inadequate housing, lack of income, and untreated mental-health concerns. Additionally, there were concerns regarding respondent-father's ability to maintain a legal income.

At the time of the termination hearing, these issues were not rectified. Erin Werth, the program coordinator for the Genesee County Baby Court, testified that housing was an "ongoing" issue for respondents. She explained that, throughout the pendency of the proceedings, respondents lived in a mobile home that was not safe or suitable for KMH. By way of example, she explained that respondents' trailer home lacked a refrigerator and had structural concerns, such as a hole in the roof, holes in the walls, broken windows, and "some holes in the floor." With regard to the hole in the floor, she explained that it had been repaired with plywood at one point, but there remained spots where, if stepped on, the floor would sag and it felt like a person could fall right through. Werth elaborated that although the hole had extended to the ground outside the trailer home, it took several months for respondents to fix it. Because of the age of the trailer, respondents were unable to secure financial assistance to make needed repairs. Werth added that the furnace in the home was broken at one point and that there were problems with bugs.

Additionally, because of issues with managing their finances, respondents had been served with an eviction notice and their power had been shut off. Although respondents owned their mobile home, it required upkeep and maintenance that they could not afford. The record reflects that because respondents could not manage their money properly, they often ran out of money shortly after being paid or receiving funds from Social Security disability. DHHS staff had suggested repeatedly to respondents that they live in subsidized housing which would have been more suitable for them, but respondents resisted these suggestions and ended up leasing an apartment without informing DHHS staff first. Additionally, KMH's maternal grandmother was listed on the lease even though she was considered unsuitable for respondents to live with because of her prior history with Child Protective Services (CPS). Werth was also concerned that, given his record of inconsist employment, respondent-father would be unable to maintain employment and provide an income to pay for respondents' housing.

The parties' mental-health issues also persisted. Dr. Harold S. Sommerschield diagnosed respondent-father with depression and a personality disorder, and he recommended a psychiatric evaluation and, potentially, medication. At the time of the termination hearing, respondent-father was not consistently attending his therapy and was not consistently taking his prescribed medication. Respondent-father continued to struggle with his anger management issues, and respondent-mother reported feeling unsafe with him and separated from him on more than one occasion. While the couple participated in marital counseling, they had difficulty applying what they learned in their sessions to their interactions in real life. This behavior was extremely detrimental to KMH, who would bang his head, rock, hide, and freeze when confronted with respondents' arguments during parenting time. While in the process of addressing his anger management issues, respondent-father was observed punching a wall in his home. Furthermore, the record reflects that to avoid similar outbursts, respondent-father would "shut down" and walk away, which interfered with his ability to engage with respondent-mother and DHHS staff about what steps needed to be taken to reunify with KMH. At the time of the hearing, respondent-father was not employed, he had gone through at least two jobs during the lower court proceedings, and he was selling plasma for extra money.

With regard to respondent-mother's mental health, Dr. Sommerschield reported that she had an "[e]xceptionally [l]ow range of intelligence," and he opined that she "does not have a good intellectual prognosis for parenting a child." Dr. Sommerschield added that "[respondent-mother] has a very poor prognosis for being able to independently parent a child and parent a child in a safe manner." He explained:

> [respondent-mother] would have difficulty caring for herself. Therefore it would not be surprising that she is so impaired in her ability to take care of a child. I do not believe that there are any services available that could significantly improve her prognosis for parenting.

Additionally, Rebecca Austin, a foster care worker with DHHS, testified that respondent-mother's cognitive delays impacted her ability to discern KMH's basic and emotional needs and respond to them. Accordingly, there was clear and convincing evidence to support the court's finding that the conditions leading to adjudication continued to exist and were not reasonably likely to be rectified within a reasonable time given KMH's age. Termination was proper under MCL 712A.19b(3)(c)(*i*).

-4-

Yet, respondent-father suggests that he and respondent-mother should have been given more time to benefit from services given his mental-health issues and respondent-mother's cognitive limitations. With some exceptions not applicable in this case, "before seeking termination of parental rights," the DHHS "has an affirmative duty to make reasonable efforts to reunify a family." *In re Hicks*, 500 Mich 79, 85; 893 NW2d 637 (2017). "As part of these reasonable efforts, the [DHHS] must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id.* at 85-86. Additionally, the DHHS is obligated by the ADA to reasonably accommodate a parent's disability before terminating his or her parental rights. *Id.* at 86.

In this case, respondents' limitations were acknowledged early in the case and the trial court cautioned that reasonable accommodations would have to be made in accord with the requirements of the ADA. The court referred the case to Baby Court in order to provide respondents with additional services. There were no objections as to the adequacy of the services provided, and, on appeal, respondent-father only argues that more time should have been provided.

There is no hard-and-fast rule with regard to how long services must be provided in order for those services to be adequate. Respondents were provided with extensive reunification services, including psychological and psychiatric mental health treatment, parenting classes, regular team meetings with the DHHS staff and Baby Court staff, one-on-one support for budgeting, help applying for subsidized housing and cash assistance, and regular reviews in the trial court to assess their progress. The DHHS staff also assisted respondents with repairs to their mobile home and provided necessary appliances, such as a refrigerator. There is no evidence that respondents were denied any necessary service or that alternative services were available that would have addressed respondents deficiencies in parenting and allowed them to successfully reunite with KMH.

Finally, respondent-father has not directed this Court to any evidence on the record that with additional, *reasonable* time he could have rectified the conditions leading to adjudication within a reasonable time *considering KMH's age*. Instead, Werth testified that even with ample support services from the DHHS, including Baby Court services and one-on-one support, any change that they experienced was "minimal if not extremely slow." She added that children form their primary attachments within the first 26 months of their life and, because KMH was already a year and a half old, time was running out for him to develop a safe and secure attachment. She added that it was already obvious that his development was "compromised." Consequently, on this record, given respondent's minimal, slow progress and KMH's time-sensitive developmental needs, providing more time to respondents in this case was not required.[2]

---

[2] Because "[o]nly one statutory ground for termination need be established," *In re Olive/Metts minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012), we decline to address whether termination was also proper under MCL 712A.19b(3)(c)(*ii*), (g), and (j).

## III. BEST INTERESTS

### A. STANDARD OF REVIEW

Respondents argue that termination of their parental rights was not in KMH's best interests. We review the trial court's decision regarding KMH's best interests for clear error. See *In re Laster*, 303 Mich App 485, 496; 845 NW2d 540 (2013).

### B. ANALYSIS

Once a trial court decides that a statutory ground exists to warrant termination of parental rights, the trial court must determine whether termination is in the best interests of the minor child. MCL 712A.19b(5). While the focus is on the parent during the statutory-grounds stage, once a parent has been determined to be unfit, the focus at the best-interest stage shifts to the minor child. *In re Moss*, 301 Mich App 76, 88-89; 836 NW2d 182 (2013). Petitioner bears the burden of establishing that termination of a respondent's parental rights is in the child's best interests by a preponderance of the evidence. *Id*. at 90. "To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (quotation marks and citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714.

Here, the record reflects that although respondents both love KMH, he was not securely bonded with them. There was evidence, however, that he had a secure attachment with his foster parents. Further, Werth testified that KMH was in need of permanence and stability, especially considering that his "window" for forming secure attachments was closing. There was also evidence that, during parenting time, KMH would exhibit negative behaviors associated with a traumatized child such as head-banging, rocking, and disassociating. In particular, he would also avoid respondent-father during parenting time sessions. Werth testified that respondents' repeated and consistent acrimony during parenting time jeopardized KMH's safety because they would not properly supervise him while they were arguing. She recounted one incident where respondent-mother placed KMH on a table and then, because she was arguing with respondent-father, he fell off the table. Further, respondent-father still struggled with managing his anger, and his compliance with his mental health treatment and medication was inconsistent. Both respondents, while attending mental health treatment individually and marital counseling as a couple, struggled with implementing what they learned in real-life situations with KMH and were unable to tend to and meet KMH's basic and emotional needs. According to Dr. Sommerschield, respondent-mother in particular simply did not have the capability to parent KMH. The trial court's ruling reflects that it considered KMH's limited and tenuous bond to respondents, his need for permanency and stability and the advantages that remaining in the foster home would provide him, the possibility of adoption, and respondents' limited parenting ability. Because these factors weighed in favor of termination of respondents' parental rights, zGATranscriptNewthe court's decision is not clearly erroneous.

-6-

Affirmed.

/s/ Douglas B. Shapiro
/s/ Jane M. Beckering
/s/ Michael J. Kelly